## VIRGINIA-CAROLINA CHEMICAL CO. V. RUFFIN.

### [88 South. 500, No. 21851.]

1. SALES. *Whether contract of sale of consignment must be determined from whole agreement; contract for delivery of fertilizer held one of consignment.*

   In determining whether a contract is one of sale or consignment, and the terms involve essential elements both of sale and consignment, its meaning is to be gathered and ascertained from a consideration of these essential elements in the light afforded by the whole contract; accordingly *held*, that the contract set out herein is one of consignment, and not one of sale, since the provisions peculiar to consignment contracts predominate and evince that consignment was intended.

2. APPEAL AND ERROR. *Evidence. Oral testimony not contradicting written contract admissible; oral testimony immaterial to issues harmless error.*

   Oral testimony which does not vary or contradict the terms of the written contract is admissible; and, where such testimony shows a fact which is immaterial to the issue in the case, it is harmless and is not reversible error.

APPEAL from circuit court of Jones county.

HON. R. S. HALL, Judge.

Action by the Virginia-Carolina Chemical Company against L. W. Ruffin. Judgment for defendant, and plaintiff appeals. Affirmed.

*Shannon & Shauber,* for appellants.

Counsel quotes the rule as laid down in 33 Cyc. on page 655, to be as follows: "A conditional sale is distinguished from a bailment in which the bailee receives possession of the goods for a particular purpose upon an agreement to re-deliver to the bailor after the purpose has been fulfilled."

So counsel for appellee did not complete the quotation, we will complete it for him. "While in a conditional sale

126 Miss.—6

possession is delivered upon an agreement to sell and buy the property in the goods to remain in the seller until payment of the price."

We are willing to have this rule of law apply to the facts in this case. We will also quote for the court's benefit the citation in support of the above rule of law which appears as note 58 on said page:

"Whatever it may be called and however hedged about with conditions, where there is a positive engagement on the part of the so-called bailee or lessee to pay a stipulated sum, upon which payment, without more, the goods are to be his, and a bill of sale to be executed therefore, this is nothing but a sale, and not a bailment which the trustee in bankruptcy, representing creditors, may assert. *In re Morris,* 156 Fed. 597."

There is no dispute over the facts that appellant filed its claim for the fertilizer, or the proceeds of the same, with the referee in bankruptcy, and endeavored to recover possession of the fertilizer, or the proceeds thereof, from the trustee of the estate of the Ruffin Mercantile Company, Bankrupt, but we most respectfully deny that the appellant contended in that court that the contract which is now before this court was a consignment contract instead of a conditional sale.

We further state that we have at no time changed our position in this matter. We have always contended that this surely was a conditional sale under the contract, but under the terms of the same we were entitled to the possession of the fertilizer, or the recovery of the proceeds of the same from the trustee in bankruptcy. There is no evidence in the record that appellant contended in the bankrupt court that this was a consignment contract, and if there was such testimony and counsel for appellee could have produced the same, we would gladly have submitted to the decision of the lower court.

In the 35th Volume of Cyc, just quoted from the brief of counsel for appellee, but on page 652 instead of 655, we find the following rule, which not only authorized us

but made it our duty to pursue the course that we did in the bankrupt court: "It is the distinguishing feature of the so-called conditional sale that the title to or property in the goods remains in the seller until payment of the price; but the buyer is entitled to the possession and use of the goods until default in payment. The security retained by the seller is not a lien, but a reservation of title and the right to pursue the property in specie. If the transaction shows an intent to pass the title as well as the possession with a mere reservation of a lien, the sale is not conditional but absolute."

We further submit that the clause in the contract requiring appellee to account for the proceeds of the sale of the fertilizer sold by him be kept separate and remitted to appellant is not inconsistent with appellant's claim to the title to the property as security for the purchase money of the fertilizer. Of course, whenever appellee had paid for the fertilizer in full this was not required of him for the reason that the fertilizer became his on the payment of the purchase price.

We further call the court's attention to the fact that this litigation is between the parties to the contract, and even if the contract was invalid as to creditors or purchasers for value, yet it remains binding on the original parties to the contract. This kind of a contract is approved by the United States supreme court in the case of *Brown, Trustee,* v. *Swofford Brothers Dry Goods Company,* reported in 53 U. S. Reports (Lawyers Edition) on page 997, the court saying, in part: "A contract which gives the purchaser the right to resell in the ordinary course of business, but provides that title shall remain in the seller until such resale, and that the proceeds derived therefrom, in whatever form existing, shall be the property of the seller, is, in Arkansas, a conditional sale and valid without record."

We again ask the court in its examination of the contract to especially notice that throughout the same the appellee admits an indebtedness from the date of the de-

livery of the fertilizer, the title to which is retained in appellant until the purchase price is paid in full.

For the reasons hereinbefore set forth, we respectfully ask that the judgment of the lower court be set aside and that a judgment be entered here in favor of appellant for five hundred seventy six dollars and seventy-six cents, with interest thereon at the rate of six per cent. per annum from May 1, 1917, until paid.

*W. J. Pack, J. M. Arnold and W. S. Welch,* for appellee.

The best discussion of the law as applied to this case and question we have been able to find is in the notes to the Ferry case and on 628 L. R. A. 1917B, and we find this: "But where title is reserved by the consignor in a contract containing apt words of consignment, it cannot be held to be a conditional sale rather than a bailment for sale, unless other provisions therein have the legal effect of rendering it in fact a sale without regard to the declared intent of the parties."

Again on page 631: "In consignment the bailee is merely the agent of the bailor, and the bailor cannot force him to pay for the goods, unless he has sold them." See *McKenzie* v. *Roper Wholesale Gro. Co.,* 9 Ga. App. 185, 70 S. E. 981; *Williams Mower and Reaper Co.* v. *Raynor,* 38 Wis. 119. "If a contract provides that the proceeds of the sales by the consignee are the property of the consignor and must be remitted to him by the consignee, less, perhaps, a designated commission to be deducted by the latter, it constitutes a consignment and agency contract, and not a sale." L. R. A. 1917B, page 338, second column, and also *Ludvigh* v. *American Woolen Co.,* 231 U. S. 522, 58 L. Ed. 345, 34 Sup. Ct. Rep. 161; *Re Reynolds,* 203 Fed. 102.

"There is no conflict among the authorities as to what a bailment is; they all agree in holding that when the identical thing delivered, though in an altered form, is to be restored, the contract is one of bailment, and the title to the property is not changed." *Mallory* v. *Willis,* 4 N. Y. 76.

In *Walker* v. *Butterick,* 105 Mass. 237, it was held that a contract was a consignment contract, and not a sale, where by its terms the consignee was to take goods for the consignor and at designated times remit the proceeds of the sales at prices charged by the latter. In *Seed Co.* v. *Queen Mill & Elevator Co.,* 23 Okla. 675, 101 Pac. 1130, it was held that a contract is one of agency, and not of sale, where it purports to bind one party thereto as the other's agent for the sale of its products at a certain place for a specified commission, the property to be sold at a price fixed by the seller, and the title to remain in him until it is sold, together with the proceeds of the sales, and the agent to remit the proceeds upon designated dates.

To the same effect see *Music House* v. *Fairbanks,* 80 Wash. 379, 141 Pac. 885. In *Barrett* v. *Gracie,* 34 Barb. (N. Y.) 20, holds that as between the parties, the transaction is one of agency and not one of sale, where property is delivered for resale, the proceeds to belong to the principal and to be collected and transmitted to him by the agent, except a stipulated sum or commission, to be retained by him, and this is true though the maximum price for which the agent may sell is not stated, the only restriction in this regard being the fixing of a minimum price. But whether this be a conditional sale or consignment, we think that there can be no question that the appellant cannot recover here for the reason that "a retail dealer receiving goods to be sold for the consignor and paid for as sold, as it was here, the goods remaining the property of the consignor until sold, is not liable for the purchase price of the unsold goods." *Levi* v. *Allen,* 15 Ind. App. 38.

The actual re-sale of the goods is a condition precedent to the liability of the consignee to the consignor as a debtor. *Depew* v. *Keyser,* 3 Duer, (N. Y.) 335; See, also, *Holleman* v. *Bradley Fert. Co.,* 106 Ga. 156, 32 S. E. 83. Then again, if the factor undertakes to guarantee the payment of debts arising from the sales by him of articles, he is construed to sell on a *del credere* commission, and this will make a *del*

*credere* commission contract and not a sale. *Re Galt,* 56 C. C. A. 470, 120 Fed. 64. In *Sturtevan Co.* v. *Dugan,* 106 Md. 587, 68 Atl. 351, 14 Ann. Cas. 675, it was held that where goods are consigned for sale to net the consignor a certain price, the consignee to have all received above that price, and to guarantee the payment of all of the purchase price of all sales made by him, the transaction creates a *del credere* agency. What thing is needed to be done here as between the parties that prevents Ruffin under this contract from being the agent of the appellant? We call the attention of the court to the fact that as between the parties, the effect of a contract may be one thing, and as between third parties another.

In *Rose* v. *Story,* 1 Pa. St. 190, it was said: "So where one receives goods upon contract, by which he is to keep them a certain period, and if in that time he pays for them, he is to become the owner, but otherwise he is to pay for the use of them, he receives them as bailee, and the property in the goods is not changed until the price is paid."

In *Becker* v. *Smith,* 59 Pa. St. 469, it was also said: "Becker, by articles, sold real estate to Linn, and agreed that he should have the use of certain personal property, and might sell materials belonging to Becker on the premises on commission and when the payments deposited with the banker reached a certain sum, Linn was to become the owner of the personal property if any remained; held not to be a conditional sale, but a bailment."

Was Ruffin, the appellee, a mere purchaser of the goods for the appellant, or was he the agent of the appellant for the sale of its merchandise? If a mere purchaser, then why all of the unnecessary wording of the agreement? What good purpose could be accomplished by this long and complicated contract? We contend that a simple reading of the agreement between the parties will show that it was sought to establish some other relation between the parties other than that of mere vendor and purchaser. When this contract is analyzed, and all unnecessary wording eliminated, there is left a simple agreement that pro-

vides that the appellant was to ship Ruffin fertilizer; that Ruffin was to store it, sell it, if he could; account for all sales. He must sell at a price not to come below a certain figure; the money from the sales and all notes, etc., were to be kept separate and belong to the appellant, and Ruffin was prohibited from selling for another than cash unless the sale was first approved by the appellant. A strange sale indeed, if it be a sale. On the other hand, we contend that Ruffin became the mere agent of the appellant because of the reasons stated above and for the further reason that the appellant retained title to the property, and made Ruffin agree to hold it subject to its orders if any remained unsold. As the general manager says: "The debt to come due when the fertilizer was sold and not before." If Ruffin was the agent or factor and not the purchaser, what duty did he owe to the appellant? He only owed the duty to use reasonable care to protect the property, 19 Cyc, (D-1-118); *Deshler* v. *Beers,* 32 Ill. 368. If he followed the instructions of the appellant, then any loss must fall on the appellant and not him. 19 Cyc. D-3-119.

If the depositor of the goods reserves the right to take them back, the transaction is regarded as a consignment and not a sale, and the consignee is a factor, 19 Cyc, D-5-120.

And the fact that the agreement provides that the consignee may retain all of the selling money above a certain fixed price, does not destroy the relation of factor and principal, and does not render the transaction a conditional sale. 19 Cyc, D-5-121. The factor is not liable if the goods are taken from his possession by *vis Major, Wilkinson* v. *Williams,* 35 Tex. App. 181. We respectfully submit that measuring the contract in this case by every rule of law and all of the decisions that Ruffin was merely the agent of the appellant in this case and not a purchaser and the appellant named its own terms; it sought the business and Ruffin did nothing to mislead the appellant at all. The intention of the parties is easily understood from the whole contract, and that intention is that the appellant held on-

to its property until Ruffin actually sold the property and then bound him up to remit, not the amount that the fertilizer might bring, but the identical money that he received for the same. Under the terms of the contract and by the sixth (6) clause or provision, and this provision alone determines that the identical money and not an amount of money equal to it, from the sale of the goods must even be kept separate from all other moneys in the hands of the customer. In other words the appellant proposed not only to direct the sales, but retained ownership of the property and in case of sale followed this up by requiring the identical money to be kept where it could be identified, and this is what Ruffin actually did. The goods were taken by law; appellant asserted its rights thereto in the courts; it lost out; it contended there that it was the owner, and having lost out on that contention, now turns around and contends that the whole thing was a sale to Ruffin and not a consignment. It appears to us that the attitude now assumed by the appellant is inconsistent with its former contention, but does appear to be in keeping with its evident purpose to draw, if possible, a contract whereby it might blow both hot and cold. The appellant having selected the man to contract with; having worded its contract as it wanted it; having shipped the goods after sending its salesman to look over the local conditions, and it knowing the local situation as it did from the actual visit of its salesman; having taken the chance it did; having claimed the property as its own and having lost out on this claim, should not now be permitted to hold an innocent party for the loss that it must suffer. Ruffin never benefitted by the agreement; the appellant did, and thought it would more and would have, had not misfortune overtaken it in its deal and the creditors of the Ruffin Mercantile Company claimed the property of the appellant, and had it subjected to their claims, or rather to have it sold and the proceeds go into the general assets of the bankrupt.

The right result was reached in the lower court, which held that the property was that of the appellant and it

lost it, because of a judgment of a court of competent jurisdiction.

It was no fault of Ruffins that there was a loss; he never did one thing with reference to the property except what he was authorized to do by the appellant, and the appellant does not deny what Ruffin says about the directions as to storing the goods. Taking the testimony of appellant's general manager that the account was not to be due until the goods were sold, and they having never been sold, unless the appellant can show that Ruffin breached the contract in some particular then Ruffin cannot be held liable, and to show any breach of the contract by Ruffin, the appellant has wholly failed, and has not even made an attempt to show a breach, and the goods not having been sold by Ruffin, we submit that there is no reasonable theory on which Ruffin can be personally held for the value of the goods.

We submit that the right result has been reached and the case should be affirmed.

HOLDEN, J., delivered the opinion of the court.

The main question presented on this appeal is whether or not the contract entered into between the appellant, Chemical Company, and the appellee, Ruffin, was a contract of sale or one of consignment.

The suit is one in debt to recover five hundred twenty eight dollars for fertilizers delivered by appellant to appellee under the contract hereinafter set out. The appellee, Ruffin, received the goods individually and stored them in a warehouse of the Ruffin Mercantile Company, which company went into bankruptcy, and the goods were taken by the trustee for the creditors by judgment of the federal court, under our state "sign statute" (Code 1906, section 4784), whereupon this suit was filed to recover against Ruffin, under the contract, as purchaser.

Ruffin contended, and was sustained by the lower court, that he was not liable because the contract was one of

consignment wherein he was merely the agent, and not the purchaser, and that he stored the goods according to the directions of the agent of the Chemical Company, and was not liable for their value when taken by the trustee in bankruptcy.

The contract between Ruffin and the Chemical Company is here set out in full:

"Agreement this 24th day of January, 1917, between Virginia-Carolina Chemical Company of Delaware, hereinafter called 'the company,' and .L. W. Ruffin, a company composed of · . . . . . ., of Ellisville P. O., Jones county, Miss., hereinafter called 'the customer.'

"(1) The company agrees to furnish to the customer, on or before May 1, 1919, from such of its factories as it may select, for sale by the customer during the ensuing season, the following specifically named amounts and kinds of fertilizers, to be taken by and charged to the customer at the prices following, and payable at the dates stated below:

| Tons of 2,000 lbs. | Brands. | Analysis. | | | Cash Price per Ton May 1, 1917. if Paid |
| | | A. P. A. Per Ct. | Ammo. Per Ct. | Pot. Per Ct. | |
| --- | --- | --- | --- | --- | --- |
| 25 | Mobile Double Eagle without Potash | $11^2$ | 2 | 0 | 23.25 |
| 25 | Royal Blood and Bone without potash | $11^2$ | 2 | 0 | 23.25 |
| 50 | V. C. Superphosphate | 16 | 0 | 0 | 18.00. |

"Customer agrees that the fertilizer taken under this contract will be sold only for cash and weekly remittances will be made covering all sales. Should time sales be considered it must be with consent of the company.

"(2) To make delivery at these prices in not less than carload lots (less than carload lots are subject to drayage and extra freight) at Ellisville, sacked and tagged as required by law, and shipped for consignment and delivery to the customer, or his duly authorized agent, as he shall in due time, as hereinafter prescribed notify and direct the company .to ship the same. On shipments ordered to a river landing direct by boat, or partly by rail and partly by

boat, or to flag station or a no-agent station on a railroad, it is agreed, when the goods are loaded f. o. b. boat or f. o. b. cars (as the case may be) at the point of original shipment and covered by bill of lading taken therefor, that it is a delivery to the customer, and that the company is thereby released from further responsibility or liability on such shipments. The company has the right to ship the goods by any route it may select.

"(3) That the customer shall sell all fertilizers at such advance over the prices hereinbefore stipulated as he may see fit, and the same shall constitute his entire compensation and commission hereunder.

"(4) The customer agrees that the company shall not be held liable for any delays in transportation by railroads or otherwise, but that he will receive for sale during the continuance of this contract all shipments of said fertilizers, and that he will take the same and pay therefor the said prices hereinbefore mentioned, and that any advance over and above such prices at which he may sell the same shall constitute his entire compensation and commission so far as the company is concerned.

"(5) That any grade or quantity of fertilizers that he may order with the consent of the company which is not mentioned specifically in this contract shall be considered to be embraced herein, subject to the same terms and conditions, if not otherwise specified, as if same were specifically mentioned, and any change of prices mutually agreed upon on any of the fertilizers embraced in this agreement shall not affect its other conditions and terms, but be subject to same. All shipments made shall be received, cared for, insured, stored, and protected free of expense to the company.

"(6) That, until sold or settled for by the customer, the fertilizers contracted for under this agreement shall remain the property of the company, and when sold, all the proceeds of the sale of such fertilizers, including cash, notes, liens, bills of sale, open accounts, and collections therefrom, whenever in possession of the customer, shall be kept

separate and be held by the customer for the use and bene-
fit of the company and subject to its order, and the same,
together with any unsold fertilizers taken under this agree-
ment, shall be the property of the company until the entire
indebtedness of the customer arising under this agreement
has been paid.

"(7) The company reserves the right to cancel the whole
or any unfilled part of this contract in case of destruction
of its works, in whole or in part, by fire, flood, cyclone, or
other agency, or in case of strikes, or inability to obtain
foreign or domestic materials or any unavoidable contin-
gency beyond the control of the company.

"(8) That any failure on the part of the customer to ful-
fill his obligation arising under this agreement shall cause
the debt hereunder to become immediately due and payable
to the company, and any report or occurrence unfavorable
to his credit shall terminate this agreement at the option
of the company.

"(9) No person (other than an officer of this company)
has authority to waive, alter, or enlarge the printed terms
of this contract, and, when done by an officer, it must be in
writing and attached to or indorsed hereon; nor is there
any agreement, verbal or otherwise, than specified herein.

"(11) That all shipments under this agreement shall be
made by or before May 1, 1917, and that payment for same
is guaranteed in full by the customer to the company, at
the prices and upon the terms stated in this agreement,
and that settlement when final statement is rendered by
the company for such shipments will be promptly made in
accordance therewith by cash, or by negotiable notes of the
customer, maturing —— payable at —— Bank of ——.

"If customer pays before May 1st next, a discount will
be allowed at the rate of eight per cent. per annum from
date of payment to that date.

"(12) In the absence of any other written agreement in
effect between the parties hereto, it is agreed, in case any
orders for goods have been shipped prior to the date of this
agreement or are shipped subsequent to the expiration
date thereof, that the prices, terms, and conditions of this

agreement shall apply thereto, and that settlement will be made accordingly by the customer when statement for same is rendered by the company.

"(13) That this agreement shall be signed in triplicate, and be operative only after being approved in writing by the company's manager.

"(14) It is expressly agreed between the parties hereto that the customer absolutely and unconditionally guarantees the accounts and notes for which said fertilizer may be sold, and that the same will be collected to the extent of his debt to the company, and agrees that the company shall have the right to enforce the collection of the notes of the customer given in settlement for said fertilizer upon maturity of the same for all unsatisfied balances thereon, notwithstanding there may be any outstanding and unpaid accounts or notes held by either party for the sale of said· fertilizers made by the customer, and does further agree to hold subject to the order of the company any fertilizers remaining unsold on May 1st, and that any renewals given of said notes due under this agreement, or other forbearances or indulgence of any kind extended to the customer, or to the maker or indorser of any notes given by any party purchasing from the customer the fertilizers agreed to be furnished hereunder, shall not affect its terms and stipulations.

"(15) The customer agrees to look exclusively for all the expenses, insurance, commissions, charges, and profits to such advanced price as he may sell said fertilizers for, and that the company shall be at no cost, expense, or charges whatever in the collection of notes and obligations of purchasers of said fertilizer delivered to or held for the company by the customer, but all the same shall be borne by the customer.

"(16) That the customer will pay over to the company all the cash proceeds or sales made for cash, when sold, and on or before the 1st day of May, 1917, will send to the company a complete list of his time, sales for which he will require, and take notes or other evidence of indebtedness and indorse and surrender to the company all notes, liens,

bills of sale, or any other evidence of debt received by him from the purchasers of said fertilizers, which evidences of indebtedness are to be returned by the company to him, if no contrary reason arises, for the purpose only of collection and remittance to the company until his debt to it has been fully paid as aforesaid. It is mutually agreed that the terms, conditions, and prices stated herein are in no way to be affected by any other contract customer or company may make."

It will be observed that the contract embodies provisions peculiar to both contracts of sale and of consignment, which makes it a difficult matter to determine whether it is one of sale or of agency. It seems to have been ingeniously drawn for the advantage of claiming under it either as one of agency or one of sale; and, as said in one authority, "the result is a hybrid contract."

The terms involve essential elements both of sale and consignment, which must be used as tests to determine its character. In construing this kind of contract its meaning is to be gathered from a consideration of all of its controlling parts, and its true purpose is to be ascertained from the whole instrument.

Following this guide, after careful consideration, we have reached the conclusion that the contract in this case is one of consignment or agency, and not one of sale.

We shall not undertake to point out in detail the different essential provisions which lead us to this decision, but shall be content to say that, taking the contract as a whole, it reasonably appears that the Chemical Company, the principal, furnished the goods to Ruffin, the agent, to be sold by him for the Chemical Company, and he to account for the goods and the proceeds arising from the sale of them, all of which was under the control of the Chemical Company.

Ruffin was to receive a commission on the sales as his compensation, at the same time he agreed to hold and return the goods, or guaranteed payment therefor if sold by him; and, taking all of the provisions together, some of

which appeal to be in conflict, we do not think the contract was intended to be one of purchase.

The contract bears many earmarks of both sale and consignment, but the essentials indicating a consignment predominate and are plain enough to overcome the theory of a sale, and leads us to conclude, from the light afforded by a reading of the entire agreement, that it is not a contract of sale. L. R. A. 1917B, 626.

Complaint is made by the appellant that the lower court erred in permitting oral testimony showing that the goods were stored in a wareroom by the direction of the agent of the appellant, contending that this testimony is inadmissible as varying the written contract. There is no merit in the point for two reasons, viz.: The oral testimony did not vary or contradict the written contract because no provision as to where the goods were to be kept is made by the written contract; and, second, the suit is one in debt for the purchase of the goods, and, that being true, it would be immaterial as to where the debtor stored the goods.

The judgment of the lower court is affirmed.

*Affirmed.*